### THE ALLANWILDE.

(District Court, D. New Jersey. November 27, 1917.)

SHIPPING ⬤⟿51—BREACH OF CHARTER—EFFECT OF WAR EMBARGO.

A sailing vessel was chartered to carry a cargo to a French port by a charter party, requiring prepayment of the freight and providing that "freight earned retained and irrevocable, vessel lost or not lost," the voyage was commenced, but the vessel was compelled by stress of weather to seek a port of refuge, and returned to New York, from which she sailed. After such return the Federal Exports Administrative Board placed an embargo on shipments by sailing vessels going through the war zone, which prevented a resumption of the voyage at that time. The owner compelled the charterer to unload the cargo, but refused to refund the freight paid. Held, that such action was a breach of the charter; that the rights of the parties were the same as though the voyage had not been commenced; that the freight was not earned, because the cargo was not forwarded, nor had the ship been lost; that under the charter the owner was bound to either forward the cargo or refund the freight money; and that, having elected to abandon the voyage and not to tranship the cargo, it was equitably liable in damages to the amount of the freight paid.

In Admiralty. Suit by the Vacuum Oil Company against the schooner Allanwilde; the Allanwilde Transport Corporation, claimant. Decree for libelant.

Barry, Wainwright, Thatcher & Symmers, of New York City (John C. Prizer, of New York City, of counsel), for libelant.

Duncan & Mount, of New York City (O. D. Duncan and Courtland Palmer, both of New York City, of counsel), for claimant.

RELLSTAB, District Judge. The same reasons—i. e., inability to bond the vessel and the need of putting it into service as soon as possible—that prompted me to hear this case out of its turn impel me now, at the close of the argument, to decide it. I am mindful that whatever decision this court may make, or whatever may be the final decision on review, one, if not both, of the parties will suffer loss. The charter party entered into was a legal contract, and under it the shipowner was obligated to transport the cargo to a port in France, subject to such exceptions and exemptions as the charter mentioned and which the maritime law annexes to such a contract.

The Allanwilde—a sailing vessel—began the voyage, but, under the stress of a heavy gale, was compelled to seek a port of refuge. It returned to New York, the port from which it started. The return was justified, and neither the vessel nor the owner can be charged with fault in that respect. Between the dates of leaving and returning to the port of New York, the Exports Administrative Board—a federal agency—promulgated a rule which, while it continued in force, prevented this vessel from resuming the voyage. This rule is as follows:

"The Exports Administrative Board, in accordance with requests made by the United States Shipping Board and by the Navy Department, has instructed the Director of the Bureau of Export Licenses not to grant licenses for any proposed shipments by sailing vessels going through the war zone. It is, of course, obvious that steamers can navigate the war zone with less danger than slow-sailing craft, and sailing ships, if used in safer waters, would to an extent release steam vessels now used in such waters. The attention of shippers is therefore called to the fact that clearance will be refused sailing vessels destined to proceed through the war zone, regardless of the fact that the goods themselves may have already been licensed. Licenses will be granted in the future for shipments to European countries only on condition that the goods are to be shipped by some vessel other than a sailing vessel. The board will revoke licenses covering goods to be shipped through the war zone, if any shippers attempt to ship them by sailing vessel."

This governmental act did not abrogate the charter party, but it did prevent an immediate execution of it. Under the terms of the charter party the shipper had prepaid the freight. The shipowner, finding itself so restrained, concluded to abandon the voyage. It notified the shipper to unload the cargo, and that upon a failure to do so it would unload and store the same at the shipper's expense. It also refused to return the freight money, claiming that it had earned it under the following provisions of the charter party:

"Freight to be prepaid net on signing bills of lading in U. S. gold or equivalent, free of discount, commission, or insurance. Freight earned retained and irrevocable, vessel lost or not lost."

The libelant, under protest, unloaded the cargo and filed this libel, alleging a breach of the charter party and claiming damages by reason thereof.

The failure to proceed with the carriage of the cargo was not due to any fault of the shipowner, but to vis major. Such an interference

was not guarded against in the contract, and may be said to have been unanticipated. The return of the vessel to the port of departure did not absolve the shipowner from carrying out the charter party. As to that obligation, it was the same as if the vessel had never left its dock. The government's embargo was not directed against cargoes of the kind covered by this charter party, but against sailing vessels entering particular waters known as the "'war zone." In my judgment, the reciprocal rights and obligations of the parties at the time of the government's embargo are to be determined as if the vessel had never started on its voyage. The embargo did not prevent a transhipment of the cargo, or prevent the shipowner retaining the cargo awaiting a lifting of the restriction.

In such circumstances the shipowner, it seems to me, was bound to either so retain or tranship the cargo. It did neither, but, for the purpose of having the use of its vessel in the waters not covered by the government's embargo, it ordered the shipper, as already noted, to remove the goods and retained the freight money as earned.

In my judgment, the shipowner's failure to do either, and its forced return of the cargo, and refusal to give up the freight money, constituted a breach of maritime duty. The clause, "freight earned retained and irrevocable, vessel lost or not lost," cannot mean that prepaid freight is earned the moment it is paid, regardless of any forwarding of the cargo. The vessel was not lost, and no forwarding of the cargo had taken place. It is conceded that, if the embargo had taken effect before the vessel had started on the voyage which proved to be futile, and the shipowner had insisted that the cargo should be retaken by the shipper, the freight money would have had to be returned.

To my mind, the fact that a futile attempt had been made to forward the cargo gave the shipowner no greater rights when its later attempts to make a new start were frustrated by the government's embargo. To absolve itself at that time of all obligations to forward the cargo, mediately or immediately, in order to have the use of the vessel for other purposes, it should at least have returned the freight money which had been paid as compensation for its transportation. Such a return and the sharing of the losses incurred in consequence of the embargo is deemed equitable. In such circumstances, the shipowner loses the expense of loading the vessel, its use until unloaded, and the opportunity to earn the freight money under the charter party, and the shipper loses the expense of unloading and the benefit of the lesser freight rate secured by said contract. To permit the shipowner to retain the freight money, after insisting on the shipper retaking his cargo, would, to my mind, be highly inequitable. Not only would the shipper be denied the benefits which it would have derived, had the shipowner carried out the charter party, but it would also have to pay for services agreed to be performed by the shipowner, but not rendered; while the shipowner would, in addition to retaining the unearned freight money, have the commercial use of its vessel during the very period it was chartered for the shipper's use. The embargo in such a case, instead of being a detriment, would be a decided benefit—a veritable windfall—for the shipowner. So inequitable would this result be that a court controlled by equitable principles should not be a

party to its consummation, unless constrained by strict law. No such law has been brought to my notice.

The libelant, in my judgment, is entitled to a decree for a return of the freight money, but nothing more. The record shows that the libelant was put to some expense in unloading the cargo from the Atlanwilde, and that in shipping this cargo in a vessel that may enter the war zone a freight almost double that paid to the shipowner in this case will have to be paid; but these expenses and larger freight rates are such as, in a balancing of the equities and apportioning of the losses incident to the enforcement of the embargo, should be borne by the shipper on a return to it of the freight money.

The record does not disclose that the shipowner, after returning to the port of departure, was put to any expense in caring for the cargo, as distinguished from that resulting to it from caring for the vessel. If there are any such expenses, and counsel cannot agree upon the amount thereof, a reference will be made to ascertain them. Otherwise, a final decree in the usual form may be entered in favor of the libelant for the sum of $49,745.50, the amount of the freight money prepaid as aforesaid.